**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

DELARREN MASON,                    )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )        No. 16–cv–1356–JPG–RJD
                                   )
SUPERINTENDENT DONALD SCHAEFER,    )
ST. CLAIR COUNTY, *et al.*         )
                                   )
        Defendants.                )

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW, Defendants, Donald Schaefer, St. Clair County, *et al.*, by and through their counsel of Becker, Hoerner, Thompson & Ysursa, P.C., and pursuant to Federal Rule of Civil Procedure 56(a), herein move this Court for summary judgment, and in support thereof, state:

## I. Background.

On December 16, 2016 and by amendment on February 9, 2018, Delarren Mason (Plaintiff) filed a Complaint against Defendants Donald Schaefer, St. Clair County, Mike Kleb, Craig Brown, Patrick Young, Dale Luetkemeyer, Brandon Miller, Ariel Moseley, Tyrone Sillas, Zac Luetkemeyer, Lucas Gehrs, Joe Vallina, Brianne Funk, Terrence Bennett, Joe Thompson, Mary-Beth Pellmann, and Jeanine Kochmann (Defendants) alleging these Defendants punished Plaintiff without due process, subjected Plaintiff to cruel and unusual punishment in solitary confinement, failed to provide Plaintiff adequate medical and mental health care, violated Plaintiff's rights under the ADA, conspired to deprive Plaintiff of federal and state law rights, intentionally inflicted emotional distress on Plaintiff, incurred liability for subordinate torts, and denied Plaintiff an education under federal and state law, and that St. Clair County must indemnify its employees. The Defendants deny these allegations and move this Court for summary judgment,

because there remain no genuine issues of material fact, such that the Defendants should be denied judgment as a matter of law.

## II. Defendants' Statement of Material Facts

On March 17, 2015 at 1:35 PM, Delarren Mason (Mason) arrived at the St. Clair County Juvenile Detention Center (Detention Center). *Ex. 1 – Mason Detention Admission Form*. Mason was under arrested by the Cahokia Police Department, on suspicion of committing an armed robbery, and he received his preliminary hearing on March 19, 2015. *Ex. 2 – Mason Admission Screening Form; Preliminary Hearing Order*. Mason was on probation for a previous aggravated battery, which he had committed in April of 2013, at Wirth Middle School in Cahokia, Illinois, when he struck a student with a folding metal chair. *Ex. 3 – Mason Admission Screening Form, 4-16-2013 Admission Form, 4-16-13 Mob Action Complaint Report*.[1]

Officer Damon Harvey conducted Mason's admission on March 17, 2015. *Ex. 1*. Officer Harvey noted that Mason attended anger counseling. *Ex. 4 – Mason Admission Physical Condition Form*. Officer Harvey noted Mason could not provide the name of his doctor or his medication. *Ex. 5 – Mason Mental Status Information*. Because of Mason's unknown history of psychiatric medication, Officer Harvey called the Detention Center's psychologist, Cheryl Prost (Prost), who advised the Detention Center should take no further action. *Ex. 5; Ex. 6 – Independent Contractor Agreement for Cheryl Prost, 2015*. Mason was prescribed Geodon and Clonidine, in 2013, by Chestnut Health Systems, where he attended counseling as a probation requirement. *Ex. 7 – Chestnut Health Systems Background Information, Prescription Order*. On March 22, 2015, Mason received his medical screening from Nurse Kochmann. *Ex. 8 – Mason Medical Screening*.

---

[1] The names of the juveniles are not included in the Complaint Report Narrative. Defendants represent Mason is "Juvenile #1".

Mason stated his last counseling with Chestnut was June of 2014. Mason voiced no complaints; he requested STD testing. ***Ex. 8***.

On March 26, 2015, Officer Vallina contacted Touchette Regional Hospital and verified Mason had a prescription for Naproxen. ***Ex. 9*** *– Ofc. Vallina Report*. On March 31, 2015, Prost called Mason's mother, Lashunda Green, who stated she would schedule a psychiatric appointment for Mason. ***Ex. 10*** *– Prost Consultation Record*. On April 1 and 13, 2015, Prost assessed Mason, noting he had not renewed his medications in eight months. ***Ex. 11*** *– Mason Mental Status Evaluations*. After eight months, prescriptions for ADHD or bi-polar disorder would not be valid. ***Ex. 12*** *– Deposition of Cheryl Prost, pg. 145 line 17–pg. 146, line 6*. Prost noted Mason exhibited symptoms suggesting attention deficit hyperactivity disorder (ADHD) or bi-polar disorder, but Prost did not diagnose Mason with these conditions. ***Ex. 12***, *pg. 91, lines 7-15, pg. 93, lines 22-24*. Prost had conversations with Supt. Schaefer noting Mason was not requesting medication or to see Prost. ***Ex. 12***, *pg. 220, lines 11-21*. Psychiatrist Dr. Louis Kraus, Mason's examining expert witness, found Mason did not have ADHD or bi-polar disorder. ***Ex. 13*** *– Deposition of Dr. Kraus, pg. 31, line 23-pg. 32, line 15; pg. 34, lines 9-11*. Prost noted Mason's mother would schedule follow-up mental health treatment for Mason. ***Ex. 11***. Ms. Green did not obtain additional mental health treatment for Mason, and she does not believe he has mental health problems. ***Ex. 14*** *– Deposition of Lashunda Green, pgs. 147-149, line 21, pg. 150, lines 16-20, pg. 105, line 14-pg. 106, line 18*.

During his detention, Mason received medication for headaches. ***Ex. 15*** *– Mason Medication Record*. Mason received treatment for an STD. ***Ex. 16*** *– Mason STD Treatment Records*. Mason did not voice mental health concerns to Nurse Pellmann. ***Ex. 17*** *– Nurse Consultation Notes*. Mason did not voice mental health concerns to Officer Kleb, Officer Dale

Luetkemyer, Superintendent Schaefer, Officer Vallina, Mr. Gehrs, Mr. Young, or Officer Zac Luetkemyer. *Ex. 18 – Deposition of A. Michael Kleb, pg. 104, lines 17-13; Ex. 19 – Deposition of Dale Luetkemyer, pg. 127, lines 8-17; Ex. 20 – Deposition of Donald Schaefer, pg. 254, lines 9-19; Ex. 21 – Deposition of Joe Vallina, pg. 200, line 11-pg. 201, line 22; Ex. 22 – Deposition of Lucas Gehrs, pg. 121, lines 16-24; Ex. 23 – Deposition of Patrick Young, pg. 63, lines 7-11, 20-24, pg. 64, line 1; Ex. 24 – Deposition of Zac Luetkemyer, pg. 103, line 24 – pg. 105, line 8.* Mr. Miller recalls Mason claimed mental health problems as an excuse for acting out. *Ex. 25 – Deposition of Brandon Miller, pg. 73, line 12–pg. 74, line 18.* Officers recall Mason only requesting medication for headaches. *Ex. 20, pg. 214, line 9-pg. 216, line 1 and pg. 254, lines 9-19; Ex. 21, pg. 180, line 23-pg. 181, line 2; Ex. 22, pg. 121, lines 16-24; Ex. 24, pg. 91, lines 12-21.* Officer Funk, Nurse Pellmann, Mr. Sillas, Officer Bennett, Officer Mosley, Officer Brown, and Mr. Thompson were not deposed. *Ex. 26 – Interrogatory Responses.*

The average length of detention at the Detention Center is six days, and a juvenile is subject to health and well-being checks every thirty (30) minutes. *Ex. 20, pg. 76, lines 10-18; pg. 138, lines 12-18; Ex. 27 – Illinois County Juvenile Detention Standards 2602.130(b)(1)(B).* The Detention Center divides juveniles into groups, based on numerous considerations. *Ex. 28 – Deposition of Lisa Brennan-Fleming, pg. 59, line 24-pg. 61, line 13.* On March 17, 2015, Mason was primarily housed in Dayroom 2, with other juveniles. *Ex. 29 – Detention Center Population Reports 3-17-15 to 3-31-15.*[2] On April 1, 2015, Mason moved to Dayroom 4, with other juveniles. *Ex. 30 – Detention Center Population Reports 4-1-15 to 5-18-15.* On May 19, 2015, Mason moved to Dayroom 1, with other juveniles. *Ex. 31 – Detention Center Population Reports 5-19-15 to 6-11-15.* From June 12, 2015, Mason moved between Dayroom 6, Dayroom 2, or Dayroom 1, with

---

[2] Exhibits 29–34 are redacted to protect the identities of the juveniles housed with Mason. Un-redacted copies of these Exhibits can be provided to the Court, if desired.

other juveniles. *Ex. 32 – Detention Center Population Reports 6-12-15 to 7-19-15*. On July 20, 2015, Mason moved to Dayroom 7, sometimes as the only juvenile in the dayroom. *Ex. 33 – Detention Center Population Reports 7-20-15 to 10-10-15*. On October 21, 2015, Mason moved to Dayroom 8, with other juveniles. *Ex. 34 – Detention Center Population Reports 10-21-15 to 10-30-15*.

On October 30, 2015, Mason was released from the Detention Center after the *nolle prosequi* of his criminal charges. *Ex. 35 – Order for Nolle Prosequi*. Mason spent a total of two hundred twenty-five (225) entire days in the Detention Center, not counting arrival and departure dates, with fifty-seven (57) days as the only juvenile in a dayroom and one hundred sixty-eight (168) days with other juveniles in a dayroom. *Ex. 36 – Calendar by 21 Century Forensics*. The longest single period of time Mason was the only juvenile in his dayroom was twenty-six (26) days, but as the only juvenile in his dayroom, Mason received full privileges in the company of other juveniles. *Ex. 36; Ex. 28*, *pg. 132, line 5-pg. 134, line 17; Ex. 37 – Deposition of Damon Harvey, pg. 141, line 4–pg. 142, line 2*.

Mason requested his own dayroom, because he wanted his own television and did not like younger juveniles. *Ex. 18*, *pg. 108, line 3-pg. 109, line 19; Ex. 19*, *pg. 183, line 7-pg. 184, line 20; Ex. 20*, *pg. 227, lines 7-19; Ex. 21*, *pg. 199, line 12–pg. 200, line 10; Ex. 22*, *pg. 75, line 7-pg. 77, line 1; Ex. 24*, *pg. 75, line 18-pg. 76, line 5; Ex. 25*, *pg. 97, line 22-pg. 98, line 19*.  Mason would manipulate his behavior to be in a dayroom alone. *Ex. 18*, *pg. 108, line 3- pg. 109, line 19; Ex. 19*, *pg. 107, lines 13-22; Ex. 20*, *pg. 231, line 19-pg. 232, line 16; Ex. 22*, *pg. 194, lines 12-25, pg. 195, line 1*. When Mason was the only juvenile in a dayroom, a connecting door between Mason's dayroom and the adjoining dayroom was open, allowing Mason to converse with a juvenile in the adjoining dayroom. *Ex. 20*, *pg. 258, line 21-pg. 259, line 5; Ex. 21*, *pg. 123, line*

*25-pg. 124, line 9.* After Mason was moved a dayroom alone, his behavior improved. *Ex. 28, pg. 132, line 5-pg.134, line 17.* Superintendent Schaefer found Mason likeable. *Ex. 20, pg. 141, line 5-6, pg. 142, lines 7-12, 23-24, pg. 143, lines 1-5.*

When a juvenile violates a facility rule, the Detention Center's only recourse is to issue warnings or award room confinement. *Ex. 38 – Detention Center Orientation Sheet, Ex. 20, pg. 44, lines 2-10.* The Illinois County Juvenile Detention Standards permit room confinement for twenty-four hours, not to exceed thirty-six hours. *Ex. 27, 2602.70(b)(2)(D),(3).* Room confinement at the Detention Center is issued in eight-hour increments. *Ex. 20, pg. 44, lines 2-10.* The hours of 10:00 PM to 7:00 AM do not count toward room confinement, because all juveniles are equally locked down at this time. *Ex. 20, pg. 234, line 22-pg. 235, line 12.* Juveniles are made aware of the facilities rules from the Orientation Sheet. *Ex. 38.* Officer Harvey read Mason the Detention Center's Orientation Sheet during admission. *Ex. 1; Ex. 37, pg. 140, lines 8-19.*

Mason received room confinement on twenty-three (23) days: 8 hours for telling Officer Kleb to "get off [his] fat ass", after multiple warnings; 8 hours for looking into the female dayroom and saying "fuck you, you damn rent a cop" to Officer Brown and an additional 8 hours, for drawing graffiti on the wall of his secure room; 16 hours for inciting other juveniles, cursing, and threatening to kill officers, after a warning from Officer Gehrs; 24 hours for a fight; 8 hours, for making a derogatory statement, after a chance to example himself; 16 hours, after two hours of inappropriate language, disruptive behavior, and disrespectful comments and being told staff was listening; 8 hours for telling Mr. Sillas "you're on some sucker shit" when told he could not take his letters outside; 8 hours for staff shopping; 8 hours for horse playing in the gymnasium; 24 hours for a second fight; 8 hours for threatening officers, refusing to follow orders, and claiming to have contraband; 8 hours for cursing; 16 hours for cursing, banging, and trying to incite other juveniles;

16 hours for banging after prior warnings; 8 hours for cursing and making disrespectful comments; 24 hours for a third fight; 8 hours for "sagging" his pants after prior warnings; 8 hours for making disrespectful comments to officers after prior warnings; 8 hours for not following orders and threatening officers; 8 hours for banging over a two hour period; 8 hours for cursing after being asked to stop; 8 hours for drawing gang and Nazi-related graffiti; and 16 hours for disrespecting and threatening officers. *Ex. 39 – Mason Incident Reports.*

Mason received warnings to correct his behavior, prior to receiving room confinement. *Ex. 18, pg. 88, lines 13-23, pg. 100, lines 15-21; Ex. 19, pg. 110, line 18-pg. 111, line 15; Ex. 21, pg. 112, line 19-pg. 113, line 4; Ex. 22, pg. 81, line 25-pg. 83, line 4, pg. 138, line 23-pg. 139, line 16, pg. 162, line 9-pg. 163, line 6.* Mason admitted many of the incident for which he received room confinement, denying recollection or fault for others. *Ex. 40 – Deposition of Delarren Mason, pg. 89, line 10 – pg. 118, line 2.* Before being housed in Dayroom 7 on July 20, 2015, Mason received seventeen write-ups. *Ex. 39.* After being housed in Dayroom 7, Mason received only seven write-ups. *Ex. 39, Ex. 28, pg.132, line 5–pg. 134, line 17.*

While on room confinement, juveniles receive recreation, if their room confinement period is longer than sixteen hours. *Ex. 20, pg. 178, line 16-pg. 179, line 5.* Mason received recreation while on room confinement. *Ex. 41 – Room Confinement Logs.* Superintendent Schaefer or his designee visits juveniles, when they are on room confinement. *Ex. 20, pg. 137, line 14-pg. 138, line 11.* Juveniles placed on room confinement may speak to a shift supervisor, using the intercom within their secure room. *Ex. 20, pg. 183, line 15-pg. 184, line 17.* Superintendent Schaefer personally spoke to Mason about his room confinement. *Ex. 20, pg. 257, line 24, pg. 258, lines 1-7.* Mason had an opportunity to write voluntary statements to complain about his detention; he wrote five statements. *Ex. 42 – Mason Voluntary Statements.* Superintendent Schaefer reviewed

Mason's voluntary statements, noting his review with his initials. *Ex. 20, pg. 17, lines 1-15; Ex. 42*. An ombudsman reviews the issuance of room confinement, to ensure the room confinement complies with Detention Center policy. *Ex. 18, pg. 62, lines 6-16; Ex. 19, pg. 97, lines 10-21, Ex. 21, pg. 91, line 20-pg. 92, line 4; Ex. 22, pg. 103, line 17-pg. 104, line 7; Ex. 23, pg. 74, line 18-pg. 75, line 1; Ex. 24, pg. 56, lines 11-19; Ex. 25, pg. 64, line 21-pg. 65, line 6*. Supervisor Brennan-Fleming urges her shift to talk to her before issuing room confinement. *Ex. 28, pg. 41, line 6-pg. 43, line 11*.

The Detention Center cannot provide juveniles with extra programs, due to funding. *Ex. 20, pg. 106, line 17-pg. 107, line 16*. The Illinois County Juvenile Detention Standards require detention centers educate juveniles until age sixteen. *Ex. 27, 2602.220(a)(1)*. The Illinois County Juvenile Detention Standards only permit class sizes of fifteen (15) students. *Ex. 27, 2602.220(b)(4)*. Mason was seventeen years old, on March 17, 2015. *Ex. 1*. Mason was expelled from his home school district for two calendar years, ending May 6, 2015. *Ex. 43 – Mason Expulsion Letter*. Illinois public schools are not required to accept students who are under expulsion. *Ex. 44 – 105 ILCS 5/2-3.13a(a)*. Mason attended thirty-one (31) days of class in the Detention Center. *Ex. 45 – Student Lists*. The Detention Center utilizes a teacher from East St. Louis District #189. *Ex. 46 – Operations Manual Excerpt; Educational Program*. The teacher, Michael Miller, saw Mason as often as he saw any student. *Ex. 47 – Deposition of Michael Miller, pg. 133, line 21-pg. 134, line 19*. Michael Miller would educate the juveniles in their rotating groups. *Ex. 47, pg. 37, line 18-pg. 38, line 16*. In the summer of 2015, Mason would not have been eligible for summer school. *Ex. 48 – Deposition of Tanya Mitchell, pg.81, line 24-pg. 82, line 16*. Mason's home school district would have allowed him to enroll in 9th grade after his release from

the Detention Center, but Mason did not enroll in 9th grade after his release from the Detention Center. *Ex. 48, pg. 81, lines 5-15; pg. 77, line 14-pg. 78, line 22.*

Regular maintenance is performed on the Detention Center, including pest spraying. *Ex. 49 – Maintenance and Extermination Records.* The Detention Center employs custodians to manage the physical plant of the building. *Ex. 20, pg. 116, line 14-pg. 117, line 8, pg. 120, line 22- pg. 121, line 9.* Juveniles are permitted out of their secure rooms to clean, and Mason took advantage of these opportunities. *Ex. 20, pg. 142, lines 2-12; Ex. 47, pg. 133, line 21-pg. 134, line 19.* The Illinois Department of Juvenile Justice inspected the Detention Center in 2015 and determined the only point of non-compliance with the Illinois County Juvenile Detention Standards was the housing of status offender juveniles. *Ex. 50 – 2015 Detention Center Inspection.*

## III. Argument

### III–A. Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Parties may use "depositions, documents … interrogatory answers, or other materials" to prove up their motion for summary judgment Fed. R. Civ. P. 56(c)(1)(A). To determine if there is a genuine issue of fact, the court views the evidence in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However "neither the mere existence of some alleged factual dispute between the parties … nor the demonstration of some metaphysical doubt as to the material facts … will sufficiently demonstrate a genuine issue of material fact." *Forman v. Richmond Police Department*, 104 F.3d 950, 957 (7th Cir. 1997) quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), internal quotations

omitted. The trial court's role is to look beyond the pleadings and use summary judgment "to narrow the issues and disclose the boundaries of the claim and defense." *Mintz v. Mathers Funds, Inc.*, 463 F.2d 495, 498 (7th Cir. 1972); *Williams v. United Credit Plan of Chalmette, Inc.*, 526 F.2d 713, 714 (5th Cir. 1976).

### III–B. Count One – Punishment without Due Process

The Defendants did not punish Plaintiff without due process; therefore, Defendants should receive summary judgment on Count One.

The Fifth and Fourteenth U.S. Constitutional Amendments mandate "No person shall be … be deprived of life, liberty, or property, without due process of law… nor shall any State deprive any person of life, liberty, or property, without due process of law…" U.S. Const. amends. V, XIV. Pretrial detainees are innocent until proven guilty and may not be punished without due process. *Bell v. Wolfish*, 441 U.S. 520 at 532 and 535 (1979); *Love v. Sheahan*, 156 F.Supp.2d 749, 755 (N.D. Illinois, 2001). Though pretrial detainees may not be punished without due process, the Seventh Circuit observed it is permissible "to punish a pretrial detainee for misconduct while in pretrial custody" provided the detainee receives some procedural protection. *Rapier v. Harris*, 172 F.3d 999, 1005 (7th Cir. 1999).

The government has a legitimate interest in safely and securely managing the facility in which a detainee is detained, and the government must be able to take steps to maintain security and order in the institution. *Id.* at 1003, citing *Bell, supra* at 540. "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." *Bell, supra* at 539. The Supreme Court has admonished lower courts that the implementation of procedures to maintain security and order lies "peculiarly within the province and professional expertise of corrections officials, and, in the

absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Rapier, supra* quoting *Bell, supra* at 540 n. 23 (quoting *Pell v. Procunier,* 417 U.S. 817, 827 (1974)) (internal quotation marks omitted).

When a prisoner faces the loss of a state-created property interest – such as the loss of good time credit – more process must be due. *Wolff v. McDonnell*, 418 U.S. 539 (1974). However due process "is not a technical conception with a fixed content unrelated to time, place and circumstances"; rather, due process is flexible concept calling for the procedural protections demanded by the particular situation. *Matthews v. Eldridge, supra* at 334, quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961) and *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Pretrial detainees who face placement in segregation for disciplinary reasons are entitled to notice and an opportunity to be heard. *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002) citing *Rapier v. Harris, supra* at 1004-05. However, "the due process clauses do not confer a right to a predeprivation hearing in every case in which a public officer deprives an individual of liberty". *Id.* at 680, citing *Ellis v. Sheahan* 412 F.3d 754, 758 (7th Cir. 2005) and collecting cases. "Reasonable punishment may be imposed to *enforce* reasonable prison disciplinary requirements but may not be imposed to sanction prior unproven criminal conduct." *Collazo-Leon v. U.S. Bureau of Prisons*, 51 F.3d 315, 318 (1st Cir. 1995), emphasis in original.

Plaintiff was not subjected to unreasonable punishment for unproven criminal conduct without due process. As an initial matter, none of the conduct for which Plaintiff received room confinement was unproven. This was not locking up an entire block of detainees for the acts of unknown perpetrators. This was not confining Plaintiff on mere suspicion of a rule violation. Each time Plaintiff was placed on room confinement, it was because he was breaking the facility rules

in the full sight of one or more officers. Plaintiff was informed of the rules upon admission, and the Defendants must be free, within reason, to maintain order and security in the Detention Center. They cannot allow Plaintiff to fight, swear, and threaten officers and other juveniles with impunity. Plaintiff was warned to correct his behavior. Plaintiff refused; only then was he placed on room confinement.

Plaintiff received numerous opportunities to be heard, after receiving room confinement. Plaintiff is not entitled to a pre-deprivation hearing, particularly as the officers actually witnessed Plaintiff violating the rules, and Plaintiff lost no property interest. Once placed on room confinement, Plaintiff could immediately use his intercom to contact the shift supervisor, if he wished to challenge his room confinement. Along with the intercom, Plaintiff was visited by the Superintendent or shift supervisor every time he was placed on room confinement. Plaintiff was given the opportunity to write complaints challenging his room confinement.

Plaintiff's room confinement was conducted in compliance with the Illinois Detention Standards and reasonably related to the Defendants' legitimate interest in maintaining safety and order in the Detention Center. The Detention Center's implementation of room confinement to ensure peaceful operations lies within the province and professional expertise of Defendants, and there is no evidence in the record suggesting Defendants exaggerated their response to Plaintiff's behavior. Sanctioning Plaintiff's misbehavior to further the reasonable goal of safety and security in the Detention Center does not amount to punishment without due process, particularly when the Plaintiff had several avenues to challenge his room confinement.

Plaintiff received adequate due process when sanctioned for misbehavior in the Detention Center; therefore, Defendants should receive judgment in their favor on Count One.

### III–C. Count Two – Cruel and Unusual Punishment in Solitary Confinement

The Defendants did not subject Plaintiff to cruel and unusual punishment in solitary confinement; therefore, Defendants should receive summary judgment on Count Two.

The Constitution's Eighth Amendment prohibits cruel and unusual punishment, and this prohibition applies to the States through the Fourteenth Amendment. U.S. Const. amend. VIII, XIV. A pretrial detainee claiming their conditions of confinement amounted to cruel and unusual punishment must show the conditions resulted in "a denial of "basic human needs" or "the minimal civilized measure of life's necessities." *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996), quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). These are extreme deprivations. *Henderson v. Sheahan*, 196 F.3d 839, 845 (1999), quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). These denials of the minimal civilized measures of life's necessities must be undertaken with deliberate indifference, meaning officers knew of and disregarded "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* quoting *Farmer v. Brennan*, 511 U.S. 825 at 837 (1994).

Officials' conduct "amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the [punishment] is not rationally related to a legitimate non-punitive government purpose, or when the [punishment] is excessive in light of that purpose." *Rapier, supra*, citing *Bell v. Wolfish, supra* at 538. The official must be inflicting the purported punishment with deliberate indifference; it is the official's intention that the detainee will die or suffer grievously. *Rapier, supra* at 1006, citing *Salazar v. City of Chicago*, 940 F.2d 233, 238-39 (7th Cir. 1991). Although steps to maintain security and order may cause discomfort to a detainee, if those steps are reasonably related to the effective management of the facility, the

steps are not punishment. *Id.* An arbitrary or purposeless condition may be punishment, but courts should take care not to impose "a court's idea of how best to operate a detention facility." *Id.* at 539.

Plaintiff was not subject to cruel and unusual punishment in solitary confinement. The record shows that from approximately July 20 until approximately October 21, 2015, Plaintiff was housed in Dayroom 7, regularly but not consistently as the only detainee in the dayroom. The longest span Plaintiff spent as the only detainee in his dayroom was twenty-six days. Nothing about spending twenty-six days as the only detainee in a dayroom amounts to cruel and unusual punishment; a deprivation of the minimal civilized measures of life's necessities. Foremost, Plaintiff requested Defendants place him in Dayroom 7. He wanted to control his television. When some Defendants told Plaintiff he could not dictate his housing, Plaintiff manipulated his bad behavior to be placed in Dayroom 7. Setting aside Plaintiff's requests to be in Dayroom 7, Plaintiff being alone in Dayroom 7 marked a drastic reduction in Plaintiff's write-ups. His write-ups reduced by more than half, and Plaintiff no longer spent his evenings trying to incite or threaten other juveniles. It is not cruel and unusual punishment if Defendants recognized the improvement in Plaintiff's behavior and permitted him to stay in his own dayroom.

Defendants did not deny Plaintiff his basic human needs. While in Dayroom 7, Plaintiff received three meals, a bedtime snack, television, the opportunity to shower daily, visits, phone calls, trips to the Courthouse, recreation, and time in the classroom both for class and recreation. Plaintiff was visited by a guard every thirty minutes for a health and well-being check. There is no evidence Defendants were deliberately indifferent to Plaintiff. Defendants took no action toward Plaintiff intending him to die or suffer grievously. Plaintiff requested his placement in Dayroom 7, but assuming Plaintiff did not request this placement, and the placement was solely a response

to Plaintiff's behavior, this was a rational response to achieve the legitimate interest of managing the Detention Center safely and securely for all juveniles, and it worked. Plaintiff's write-ups reduced, he still received his privileges, and he could watch whatever he wanted on television. The other juveniles had every right to feel secure in their dayrooms, without the Plaintiff fighting, inciting, or threatening them. Plaintiff's temporary placement in Dayroom 7 was not cruel and unusual punishment; it was a reasonable arrangement requested by Plaintiff.

Because Defendants did not subject Plaintiff to extreme deprivations in Dayroom 7, deliberately intending Plaintiff to suffer, but rather as a rational response to Plaintiff's requests and behavior, Defendants should receive judgment in their favor on Count Two.

### III–D. Count Three – Failure to Provide Adequate Medical Care

Defendants Pellmann and Kochmann provided Plaintiff with adequate medical and mental health care; therefore, Defendants Pellmann and Kochmann should receive summary judgment on Count Three.

Pretrial detainees sustain a claim for inadequate medical treatment if they have a serious medical need to which the defendant was deliberately indifferent. *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995), citing *Brownell v. Figel,* 950 F.2d 1285, 1289 (7th Cir. 1991); *Salazar v. City of Chicago*, 940 F.2d 233, 239 (7th Cir. 1991). A serious medical need is one that is "life threatening or poses a risk of needless pain or lingering disability if not treated at once. [Internal quotations, citation omitted]. *Cox v. Hartshorn*, 503 F.Supp.2d 1078, 1084-85 (C.D. Illinois 2007) citing *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001).

Recently, the Seventh Circuit receded from the deliberate indifference standard, adopting a standard of objective unreasonableness. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018), citing *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015). However, the *Miranda* Court

clarified this does not reduce the standard for inadequate medical care claims. *Id.* at 353. After reviewing the *Kingsley* two-part state of mind inquiry – (1) what was the defendant's state of mind with respect to the physical acts and (2) what was the defendant's state of mind with respect to whether the use of force was excessive – the *Miranda* Court held, "the first [inquiry] asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of Gomes's case" and the second step is an objective consideration. *Id.* at 353-54, quoting *Kingsley, supra* at 2472. The *Miranda* court concluded inadequate medical care claims still require more than a showing of negligence or even gross negligence. *Id.* at 353, quoting *Gordon v. County of Orange*, 888 F.3d 1118 at 1125 (9th Cir. 2018) (a detainee must "prove more than negligence but less than subjective intent—something akin to reckless disregard"), additional citations omitted.

Plaintiff's serious medical needs are listed as ADHD, bi-polar disorder, asthma, and chronic headaches. Plaintiff does not have ADHD or bi-polar disorder. Plaintiff was examined by a psychiatrist, Dr. Louis J. Kraus, who concluded Plaintiff does not have these conditions. However, to whatever extent Plaintiff insists he does have these mental health conditions, the Defendants' response to these conditions was not objectively unreasonable. The Detention Center employs Defendant Cheryl Prost as their on-staff psychologist. On March 17, 2015, Officer Harvey contacted Defendant Prost about Plaintiff's unknown psychiatric medications, and Defendant Prost advised no further action was needed. At Plaintiff's March 22, 2015 medical screening, Defendant Kochmann noted Plaintiff's claims of ADHD and bi-polar disorder, but Plaintiff did not ask for treatment of them. He asked for STD testing, which he received. Plaintiff was seen by Defendant Prost on in April of 2015. There is no evidence suggesting Defendants Kochmann or Pellmann impeded Defendant Prost in her handling of Plaintiff. Defendant Prost

received assurances from Plaintiff's mother that she would obtain the appointment he needed. There is no evidence to suggest Defendants Kochmann or Pellmann impeded Plaintiff's mother from seeking psychological help for Plaintiff or recklessly disregarded a response to requests from Plaintiff or his mother for mental health treatment.

Plaintiff does not claim he suffered an untreated asthma attack in the Detention Center. There is evidence Plaintiff complained of headaches and an equal amount of evidence Plaintiff received medication for his headaches. On March 26, 2015, Defendant Vallina called Touchette Hospital and verified Plaintiff's prescription for Naproxen, which Plaintiff received in March, April and September. Plaintiff received Tylenol in March, April, July, and September. Plaintiff received Ibuprofen in July. Plaintiff receive Neosporin in October. Nurse Pellmann provided Plaintiff with STD testing and treated his STD. Superintendent Schaefer gave Plaintiff antibiotics. Nurse Pellmann kept notes of her interactions with Plaintiff, and Plaintiff never complained of mental distress to Nurse Pellmann.

The only medical need which posed a risk of suffering to Plaintiff, if not treated, were his chronic headaches and his STD. These conditions were treated by Defendant Pellmann and the other Defendants. Nurse Kochmann only conducted Plaintiff's intake, and there is no evidence she ignored or impeded the treatment of Plaintiff. There is no evidence Nurses Pellmann or Kochmann purposefully, knowingly, or recklessly disregarded Plaintiff's medical and mental health conditions intending for Plaintiff to suffer. Nurse Kochmann and Nurse Pellmann timely conducted the Plaintiff's intake and treated the Plaintiff's existing, complained-of conditions.

For these reasons, Nurses Pellmann and Kochmann are entitled to judgment in their favor on Count Three.

### III–E. Count Four – Americans with Disabilities Act

Plaintiff is not disabled, and Defendant Schaefer did not fail to accommodate Plaintiff's non-existent disabilities; therefore, Defendant Schaefer is entitled to summary judgment on Count Four.

Title II of the Americans with Disabilities Act (Title II) states "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132. A disability is "a physical or mental impairment that substantially limits one or more major life activities … a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. §12102(1). Major life activities include a variety of physical and mental functions. 42 U.S.C. §12102(2)(A). An impairment is substantial when the person "is unable to perform a major life activity that the average person in the general population can perform or is significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 937 (7th Cir. 2007) quoting 29 C.F.R. § 1630.2(j)(1)(i)-(ii). To state a claim under Title II, a plaintiff must plead they are a qualifying individual who was denied the benefits of services provided by a public entity because of their disability. *Wells v. Bureau County, et al.*, 723 F.Supp.2d 1061 at 1087 (C.D. Illinois, 2010); *Hahn v. Walsh*, 915 F.Supp.2d 925, 956 (2013).

The Seventh Circuit acknowledged an existing split in the Circuits whether Title II applies to pre-adjudication facilities. *Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir. 1996) ("The second question … is the applicability of the disabilities act to correctional facilities. The question has divided the circuits"). The *Bryant* Court concluded "Even if there were (as we doubt) *some* domain

of applicability of the Act to prisoners, the Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. No discrimination is alleged; Bryant was not treated worse because he was disabled." *Id.* at 249, emphasis in original. The *Bryant* court cautioned, "the courts have labored mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishments clause into a medical malpractice statute … We would be exceedingly surprised to discover that Congress had made an end run around these decisions in the Americans With Disabilities Act." *Id.* at 249.

There is no evidence Plaintiff suffered from ADHD or bi-polar disorder, the two specific disabilities claimed by Plaintiff in his Amended Complaint. Plaintiff's Amended Complaint entirely omits how his alleged disabilities substantially impaired any of his major life activities; this is neither pleaded nor proven, but the point is moot, because Plaintiff's own expert witness, Dr. Kraus, could not diagnose Plaintiff with these conditions. That Defendant Prost felt Plaintiff exhibits some symptomology is not dispositive; Defendant Prost cannot medically diagnose patients. The deposed Defendants testified they did not regard Plaintiff as having a mental condition. Plaintiff's vague statements of anger and having counseling during his intake are not sufficient to create a record of a disability. The Defendants answering Interrogatories made no admissions about Plaintiff's alleged disabilities. Simply, Plaintiff's was not disabled; he does not qualify for Title II protections.

Assuming *arguendo* there is a scintilla of evidence suggesting Plaintiff had a disability, Plaintiff cannot identify a program he was denied *because of* that disability. Defendant Schaefer testified the Detention Center has little operational funding, and their art therapy program ended years ago. There are no programs at the Detention Center which were available to other detainees but not Plaintiff, and none of those non-existent programs were denied Plaintiff because he claimed

to have ADHD and bi-polar disorder. Plaintiff was not treated worse because of his disability. To any extent Plaintiff claims that not receiving his expired prescriptions was being denied a service, this is an attempt to end-run a medical malpractice claim (or double dip Plaintiff's already-pleaded Count Three) as a Title II claim, and Congress did not intend this with the passing of Title II, as observed by the Seventh Circuit in *Bryant*.

Because Plaintiff is not disabled, cannot identify a major life activity impeded by his non-existent disability, and was not denied a program or service because of his disability, Defendant Schaefer should receive judgment on Count Four.

### III–F. Count Five – Dual Conspiracies

There were no conspiracies to deprive Plaintiff of his constitutional rights; therefore, Defendants are entitled to summary judgment on Count Five.

The Seventh Circuit defines conspiracy as "a "combination of two or more persons in concert to commit an unlawful act, or to commit a lawful act by unlawful means." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) quoting *Scherer v. Balkema*, 840 F.2d 437 at 441 (7th Cir. 1988).  To establish a conspiracy in a §1983 suit, "the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights". *Id.* quoting *Balkema, supra* at 441. A plaintiff may cite to circumstantial evidence, but this evidence cannot be speculative. *Id.* at 511 quoting *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003). The *Seniff* court reasoned "the existence of numerous phone calls between alleged conspirators, 'standing alone, merely proves that [the individuals] remained in contact.... To assert that the calls are evidence of a conspiracy is simply speculation." *Seniff, supra* at 785, quoting *Goetzke v. Ferro Corp.,* 280 F.3d 766 at 778 (7th Cir. 2002). Mere allegations of a conspiracy are not sufficient. *Chicago Miracle Temple Church, Inc.*

*v. Fox*, 901 F.Supp. 1333, 1347-48 (N.D. Illinois 1995) quoting *Richardson v. City of Indianapolis*, 658 F.2d 494 (7th Cir.1981).

The record contains no evidence suggesting two or more Defendants agreed to deprive Plaintiff of his constitutional rights. Defendants have demonstrated Plaintiff was not deprived his constitutional rights, and there is an equal lack of evidence for a conspiracy. Plaintiff's allegations amount to speculation – Defendants work together so they must have conspired about Plaintiff, but this is not sufficient evidence of a conspiracy. Working together and discussing juveniles does not equate to a conspiracy. Numerous Defendants work on different shifts; Defendants Kleb and Vallina work the day shift, Defendants Gehrs and Young worked the afternoon shift, and Defendant Mosley works nights. If these Defendants discussed Plaintiff, it was in passing between shifts.

To say Defendants working the same shift conspired to deprive Plaintiff's rights, such as by two or more Defendants disciplining Plaintiff, is equally not evidence of a conspiracy; it is evidence of colleagues working together. Supervisor Brennan-Fleming encourages her officers to talk to her before disciplining detainees, and no officer should fear being accused of a conspiracy because they spoke to a supervisor before issuing discipline. When Defendant Luetkemyer asked other officers to witness Plaintiff's behavior, this was to ensure discipline was warranted and the behavior was seen by multiple officers before Plaintiff received room confinement. When Defendants acquiesced to Plaintiff's request and placed him in Dayroom 7, this was not a conspiracy, it was at Plaintiff's ask. These practices should not be condemned; they are to ensure detainees are treated fairly, safely, and securely.

Because there is no evidence Defendants conspired to deprive Plaintiff's rights, only evidence of Defendants working together to ensure the safety and security of the Plaintiff and the Detention Center, Plaintiff cannot sustain his claim of dual conspiracies in Count Five.

### III–G. Count Six – Intentional Infliction of Emotional Distress

No Defendant intentionally inflicted emotional distress on Plaintiff; therefore, Defendants are should receive judgment in their favor on Count Six.

To sustain a claim for intentional infliction of emotional distress, a plaintiff must demonstrate the defendant's conduct was extreme and outrageous, the defendant knew of the high probability their actions would cause severe emotional distress, and that the conduct of the defendant did cause severe emotional distress. *Bianchi v. McQueen*, 58 N.E.3d 680, 699 (2nd Dist. 2016), citing *Kolegas v. Heftel Broadcasting Corp.,* 154 Ill.2d 1, 20 (1992). A person in a position of authority may commit extreme and outrageous conduct. *Kolegas, supra* at 21. However, extreme and outrageous conduct does not include insults, indignities, threats, annoyances, petty oppressions or trivialities. *Id.* at 700, quoting *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 89–90 (1976). Emotional distress including "fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea" is not actionable, and "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." Restatement (Second) of Torts, sec. 46, Comment j. Extreme and outrageous conduct goes beyond all possible bounds of decency; it is conduct intolerable in a civilized community. *Kolegas, supra*.

Defendants' actions do not amount to conduct intolerable in a civilized society and were not undertaken to cause Plaintiff extreme or outrageous emotional distress. It cannot be denied that being detained, if innocent, is distressing, but Defendants are not responsible for Plaintiff's

detention. Defendants did not arrest Plaintiff. To the extent Plaintiff claims Defendants intentionally inflicted emotional distress on him, relative to his detention, this argument is meritless. Defendants sent Plaintiff to his room when he broke the rules, after giving him opportunities to correct his behavior or when Plaintiff was fighting. Plaintiff admitted he broke the rules; Defendants must maintain a safe and secure facility for every juvenile, not just Plaintiff, and if that means Plaintiff must sit in his room after breaking the rules, this is the necessary consequence of Plaintiff's behavior and not extreme or outrageous. Defendants may be in positions of authority, but Plaintiff's behavior suggests he had no qualms defying this authority to take extra phone time or keep pencils in his room.

Defendants could not know there was a high probability that putting Plaintiff in Dayroom 7 would cause him distress otherwise intolerable in a civilized society. Plaintiff asked to be in Dayroom 7, and if he could not get his way by asking, he manipulated his behavior to be placed in Dayroom 7. If Defendants put Plaintiff in Dayroom 7 to control his behavior, this was not motivated to cause Plaintiff distress. This was to ensure the safety and security of the entire Detention Center. Superintendent Schaefer testified he liked Plaintiff; he did not have his officers emotionally brutalize Plaintiff. The Defendants did not deny Plaintiff access to programs because of a disability, and they ensured Plaintiff's headaches and other medical concerns were treated. Defendants got Plaintiff out of his cell to help around the Detention Center. They treated Plaintiff fairly and professionally.

Defendants did not engage in conduct intended to cause Plaintiff extreme and outrageous emotional distress which no reasonable person could be expected to endure; therefore, Defendants should receive summary judgment on Count Six.

### III–H. Count Seven – Civil Conspiracy

The Defendants did not engage in a civil conspiracy against Plaintiff; therefore, Defendants are entitled to judgment on Count Seven.

Under Illinois law, to succeed in a civil conspiracy claim, a plaintiff "must eventually establish that there was an agreement between two or more persons with the goal of accomplishing either an unlawful purpose or a lawful purpose by unlawful means and at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused injury to the plaintiff." *Curtis v. Stein Stell Mill Services, Inc.*, 2016 WL 2733413 (S.D. Illinois 2016). The "gist" of a conspiracy claim is not the agreement, but the tortious act performed in furtherance of the agreement. *Id.* citing *Adcock v. Brakegrate, Ltd.*, 164 Ill.2d 54, 63 (1994).

The record is devoid of even an inference that two or more Defendants came together and agreed to exact a tort on Plaintiff. There is no evidence of a tort being committed against Plaintiff, but to whatever extent Plaintiff alleges he was subjected to a tort, there is no evidence Defendants conspired together to commit this tort. In their Interrogatory responses, Defendants Funk, Pellmann, Sillas, Bennett, Mosley, and Brown make no such admissions. Defendants Schaefer, Kleb, Vallina, Luetkemyer, Luetkemyer, Gehrs, Young, Miller, and Kochmann testified to no such conspiracy. They are fellow officers. If they discussed Plaintiff, it was only to accomplish their lawful purpose of operating the Detention Center in a safe and secure method. To say that co-workers having conversations in briefing or on shift about a juvenile residing in the Detention Center equates to a conspiracy to intentionally inflict outrageous emotional distress is untenable. Defendants could never discuss the juveniles in their care, for fear it would later be construed as a conspiracy.

The absence of a tort directed to Plaintiff and the complete lack of evidence Defendants conspired to commit a tort against Plaintiff entitle Defendants to summary judgment on Count Seven.

### III–I. Count Eight – *Respondent Superior*

Because there is no evidence any Defendant committed a tort against Plaintiff, Defendant Schaefer is not liable in *respondeat superior* and should receive summary judgment on Count Eight.

In Illinois law, a *respondeat superior* relationship exists when there is an "employer/employee relationship, the [employer] controlled or had the right to control the conduct of the alleged employee, and the alleged conduct of the employee fell within the scope of the … employment." *Wilson v. Edward Hospital, et al.*, 2012 IL 112898 (2012), citing *Oliveira-Brooks v. Re/Max International, Inc.*, 372 Ill.App.3d 127, 134 (1st Dist. 2003). An employee's actions occur within the scope of employment when the conduct was reasonably contemplated as part of the employment, the conduct occurred within the authorized time and space of the employment, and if the employee's conduct was motivated, as least in part, by a purpose to serve the employer. *Bagent v. Blessing Care Corp.* 224 Ill.2d 154, 164 (2007). However, when considering the conduct of a truck driver intentionally causing other motorists severe emotional distress, an Appellate Court found "Defendant Packerland would not be vicariously liable under *respondeat superior* for its driver's intentional infliction of severe emotional distress, since such conduct would be outside the scope of the driver's employment. *Rosenberg v. Packerland Packing Co. Inc.*, 55 Ill.App.3d 959, 963 (1st Dist. 1977) citing *Nelson v. Nuccio*, 131 Ill.App.2d 261, 264 (1st Dist. 1971).

Plaintiff's claim that Defendant Schaefer is liable in *respondeat superior* is limited to his state law tort of intentional infliction of emotional distress. The foregoing argument, as well the

record and evidence, demonstrate the individual Defendants did not intentionally inflict emotional distress on the Plaintiff; therefore, Defendant Schaefer cannot be liable for actions of his employees. Assuming *arguendo* the individual Defendants intentionally inflicted emotional distress on Plaintiff, this conduct was not within the scope of their employment. There is no evidence to suggest Defendant Schaefer made it a condition of employment to inflict emotional distress on detainees so severe that no reasonable person could be expected to endure it. Defendant Schaefer liked Plaintiff; he did not want him mistreated, and these officers come to work each day to help the kids, not to cause them emotional torment intolerable in a civilized community. No amount of intentional infliction of emotional distress by the officers was motivated to serve Defendant Schaefer; Defendant Schaefer does not ask this from his officers.

Because there is no evidence Defendants intentionally inflicted emotional distress on Plaintiff, and no evidence the intentional infliction of emotional distress was reasonably contemplated within the scope of employment, Defendant Schaefer is not liable to Plaintiff in *respondeat superior*.

### III–J. Count Nine – Denial of Property Interest without Due Process

There is no property interest in an education; therefore, Defendant Schaefer is entitled to summary judgment on Count Nine.

The United States Supreme Court ruled "Education … is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 35 (1973). *San Antonio* concerned a Texas system for financing public education. *Id.* at 4. The Supreme Court was unpersuaded by arguments that the lack of education financing in certain school districts was a violation of fundamental rights, ruling "Even if it were conceded that some

identifiable quantum of education is a constitutionally protected prerequisite … we have no indication that the present levels of educational expenditures in Texas provide an education that falls short." *Id.* at 36-37.

The Court reasoned "Whatever merit appellees' argument might have if a State's financing system occasioned an absolute denial of educational opportunities … that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved". *Id.* at 37. The Court held that whether the financing system denied students some right to education was inappropriate for strict scrutiny analysis. *Id.* at 39. The Court codified the standard for review as "whether the challenged state action rationally furthers a legitimate state purpose", cautioning "the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them." *Id.* at 55, 58.

The guarantee of substantive due process is the protection from government interference with fundamental rights – which the *San Antonio* Supreme Court found does not include education – and "a State is under no constitutional duty to provide substantive services for those within its border." *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982). However, the *Youngberg* Court clarified that when a person becomes wholly dependent on the State, the State assumes a duty to provide minimal services in the protection of fundamental rights. *Id.* The *Youngberg* Court likened state institutionalization to pre-trial detention, agreeing the State had a duty to provide "minimally adequate or reasonable training to ensure [plaintiff's] safety and freedom from undue restraint". *Id.* at 319. The review between a denial of services and the rights impacted must consider the state's legitimate government objectives; a balancing of the person's liberty interest against the relevant state interests. *Id.* at 320-21.

Plaintiff's claim he has a due process right to education is simply unfounded. The Supreme Court could not be clearer – education is not a fundamental protected right. There is no explicit protection. There is no implicit protection. The Supreme Court will not concede there is an identifiable quantum of constitutional protection for education. Even if they were to so-concede, the determination of the adequacy of expenditures was not a question for the court; it was a question for lawmakers. Likewise, Plaintiff's claim of the inadequacy of the education he received at the Detention Center is inappropriate for determination by a court. It is a question for Illinois lawmakers. Where the question is whether the Plaintiff, if not detained, could have received more education than he received while detained, this relative difference is not an appropriate determination for a court.

To the extent Plaintiff argues that, as a pretrial detainee in county custody, he was wholly dependent on the county for his education, the Detention Center's efforts to provide Plaintiff an education must be rationally related to their legitimate operational interests. First, Plaintiff was seventeen when detained; therefore, he was not legally qualified for education in the Detention Center. Second, Plaintiff was under expulsion from his home school district, meaning the school district providing education to the Detention Center was under no duty to educate Plaintiff until the end of his expulsion. Finally, Plaintiff attended thirty-one (31) days of class, which the Detention Center teacher testified was just as often as he saw any other student. The Detention Center must rotate students in groups of no more than fifteen detainees, taking into account all the considerations of keep separates, the juveniles' other obligations, and staffing levels. Plaintiff received minimally adequate services from the Detention Center, while the Detention Center reasonably observed their interest in operating a safe and secure facility.

The Plaintiff has no due process right to education, but even if the Plaintiff was owed some quantum of education, the Detention Center provided Plaintiff with minimally adequate services when balanced alongside the Detention Center's interests; therefore, Defendant Schaefer is entitled to summary judgment on Count Nine.

### III–K. Count Ten – Denial of Illinois Constitutional Right to an Education

The interpretation of Article X of the Illinois Constitution is a non-justiciable issue; therefore Plaintiff's Count Ten should be dismissed.

Article X, Section 1 of the Illinois Constitution states:

> "A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities. The State shall provide for an efficient system of high quality public educational institutions and services. Education in public schools through the secondary level shall be free. There may be such other free education as the General Assembly provides by law. The State has the primary responsibility for financing the system of public education." IL Const. Art. X, §1.

The quality of public education is a question for the Illinois legislature, not a justiciable matter. *Lewis E. v. Spagnolo*, 186 Ill.2d 198, 205 (1999). In *Lewis*, the plaintiffs argued Article X, Sec. 1 "grants them the right to a "minimally adequate education," and they may sue state and local officials directly under this article for deprivation of that right. *Id*. The plaintiffs argued there was functionally no education in their district. *Id.* at 208. The Court rejected this argument, citing precedent which determined "questions relating to the quality of education are solely for the legislative branch to answer." *Id.* at 206, quoting *Committee for Educational Rights v. Edgar,* 174 Ill.2d 1 at 24 (1996). The *Lewis E.* court was unpersuaded by the plaintiff's arguments, holding:

> "No matter how the question is framed, recognition of the plaintiffs' cause of action under the education article would require the judiciary to ascertain from the constitution alone the content of an "adequate" education. The courts would be called upon to define what minimal standards of education are required by the

constitution, under what conditions a classroom, school, or district falls below these minimums so as to constitute a "virtual absence of education," and what remedy should be imposed. Our decision in *Committee for Educational Rights* made clear that these determinations are for the legislature, not the courts, to decide." *Id.* at 209, citing *Edgar*, supra.

Just as in *Lewis*, Plaintiff raised the non-justiciable issue of an alleged denial of education under Article X of the Illinois Constitution. The Illinois Supreme Court, in *Lewis* and in *Edgar*, definitively held that interpretation of Article X is a question for the Illinois legislature. It is not for a court to determine whether the education system in the Detention Center was adequate or what constitutes an absence of education. It is not for the court to make a quality determination based on the Illinois Constitution. Plaintiff alleges he was denied education, but the Illinois Detention Standards only mandate education at a detention center until age sixteen, and Plaintiff was seventeen years old. The Illinois Constitution leaves education to the Illinois General Assembly and whatever laws the General Assembly puts in place, including permitting public schools to deny education to expelled students or setting the maximum age to which detention centers must educate juveniles. The Detention Center complied with the law. Plaintiff's claims under the Illinois Constitution are non-justiciable. Plaintiff must seek redress with the Illinois General Assembly if he wishes to challenge the adequacy of educational services at the Detention Center.

Based on the clear Illinois Supreme Court precedent that Article X of the Illinois Constitution is non-justiciable and must be left to the Illinois legislature, Plaintiff's Count Ten must be dismissed.

### III–L. Count Eleven – Indemnification

Because the individual Defendants are not liable to Plaintiff, St. Clair County is not liable to indemnify its employees and should receive summary judgment on Count Eleven.

The Illinois Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) states "If any claim or action is instituted against an employee of a local public entity based on an injury allegedly arising out of an act or omission occurring within the scope of his employment … the entity may elect to … indemnify the employee". 745 ILCS 10/2-302(b)-(d).

Plaintiff alleges Defendants violated his rights while acting in the scope of their employment at the St. Clair County Juvenile Detention Center, but consideration of the arguments and affirmative defenses herein, along with a review of the record, testimony, and evidence submitted herewith, proves no violation of the Plaintiff's rights occurred. No Defendant violated the Plaintiff's rights at any point during Plaintiff's detention. Defendants treated Plaintiff equally and fairly, with care for both Plaintiff and the juveniles around Plaintiff. Because no Defendant caused Plaintiff any injury or acted willfully and wantonly toward Plaintiff, Plaintiff's claim for indemnification should be dismissed.

### III–M. Affirmative Defenses

III–M–1. Defendants' Qualified Immunity

Defendants are entitled to qualified immunity from suit; therefore, Defendants should receive summary judgment.

This Court has held "government officials are protected from civil liability when performing discretionary functions under the doctrine of qualified immunity so long as their conduct does not violate clearly established … constitutional rights of which a reasonable person would have known." *Dustin M. James v. Debra Hale, et al.*, 2016 WL 7717823 at *1 (S.D. Illinois, 2016) quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001).U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Saucier v.*

*Katz*, the Supreme Court defined the two-step process for determining entitlement to qualified immunity. *Saucier v. Katz*, 533 U.S. 194 (2001), receded from by *Pearson v. Callahan*, 555 U.S. 223 (2009).

The *Saucier* Court stated "A court … must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201, citing *Siegert v. Gilley,* 500 U.S. 226, 232 (1991). Next, "if a violation could be made out … ask whether the right was clearly established." *Id.* The Court cautioned "[t]his inquiry … must be undertaken in light of the specific context of the case". *Id. Pearson* later clarified these two steps could occur in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). To know if a right is clearly established, it "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *James, supra* at \*2, citing *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  The unlawfulness of a particular official's action must be apparent "in light of the pre-existing law." *Id.* citing *Estate of Escobedo*, *supra*.

Defendants are entitled to qualified immunity. Regarding placement of Plaintiff on room confinement, there is no question Defendants' actions did not violate Plaintiff's constitutional rights. Plaintiff admitted he broke the rules; Defendants placed him in his room for breaking the rules, usually after several warnings. If some violation of Plaintiff's right could be made out, there is nothing to suggest Defendants knew these rights were clearly established. The Illinois Detention Standards permit the use of room confinement as discipline, up to thirty-six hours of room confinement time. The placement of Plaintiff on room confinement was reasonably related to the legitimate goal of maintaining order and security in the Detention Center. Plaintiff's room confinement was not excessive. Defendants did not beat Plaintiff, they sent him to his room.

Nothing about this legally-sanctioned response suggests Defendants could know their conduct violated existing law.

The same is true of Defendants placing Plaintiff in Dayroom 7. First, Plaintiff requested this placement. When refused, Plaintiff acted out knowing he would be moved to Dayroom 7, so he could watch his preferred television shows. Plaintiff's write-ups decreased significantly when Plaintiff was allowed his own dayroom, including no longer being written up for trying to incite or threaten other juveniles. Defendants must maintain order and security in the Detention Center for all juveniles, and placing Plaintiff temporarily in his own dayroom but giving him every other privilege could not be rationally seen by Defendants as violating Plaintiff's clearly-established constitutional rights. Giving Plaintiff Tylenol, Ibuprofen, Naproxen, Neosporin, and Azithromycin to treat his medical complaints did not violate his rights. Calling Cheryl Prost when Plaintiff reported no memory of his psychiatric medications does not violate Plaintiff's clearly-established rights. Plaintiff went to class, as much as any other detainee attended class, despite Plaintiff's expulsion, being over the legal age for mandatory education in the Detention Center, and having no due process right to education. Plaintiff was not denied access to any programs because of his disabilities, but to whatever extent Plaintiff could not access programs which did not exist because of his disabilities which also do not exist, this did not violate Plaintiff's clearly established constitutional rights.

All the Defendants actions were taken with the legitimate governmental objective of maintaining the order, security, and safety of the Detention Center. Their actions did not violate Plaintiff's constitutional rights, and Plaintiff's rights as alleged were not clearly-established when the Defendants acted; therefore, Defendants are entitled to qualified immunity.

<u>III–M–2. Defendants' Absolute Immunity; 745 ILCS 10/1- 101, *et seq.*</u>

Defendants are entitled to absolute immunity under the Illinois Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act).

The Tort Immunity Act immunizes local public entities from "an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law" and from "an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-103, 109. Likewise, "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused", and "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." Id. at 2-201 and 202. Further, "a public employee … acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person." Id. at 2-204. Unless an exception for willful and wanton conduct exists, immunities under the Tort Immunity Act are absolute. *Pouk v. Village of Romeoville*, 405 Ill.App.3d 194, 197-98 (3rd Dist. 2010) citing 745 ILCS 10/2-103. The Tort Immunity Act defines willful and wanton conduct as, "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others". 745 ILCS 10/1-210.

Defendants, both individual and municipal, are entitled to absolute immunity on Plaintiff's state law claims. Plaintiff claims all individual defendants engaged in intentional conduct which caused the Plaintiff extreme emotional distress. The conduct in issue is not described by Plaintiff in Count V, but this must refer to Defendants placing Plaintiff on room confinement, placing Plaintiff in Dayroom 7, and providing Plaintiff with medical care and classroom time, along with his other privileges. Defendants are entitled to absolute immunity, because they were all employees

engaged the act of enforcing the law; the Detention Standards. The Detention Standards permit the issuance of disciplinary room confinement, and Plaintiff admitted to his misbehaviors. The Detention Standards require staff to ensure the safety and security of all youth, so placement of Plaintiff in Dayroom 7 to curtail Plaintiff's incitements and threats against other juveniles furthers this law, setting aside that Plaintiff requested housing in Dayroom 7. The Detention Standards do not require juveniles over age sixteen be educated, but Defendants sent Plaintiff to the classroom. The Detention Standards require juveniles receive medical care; Plaintiff received treatment for his headaches and STD. No evidence suggests Defendants were willful or wanton toward Plaintiff. There is no evidence Defendants engaged in a course of action with the actual or deliberate intent to harm Plaintiff or acted with utter indifference or conscious disregard for the safety of Plaintiff. These Defendants are entitled to absolute immunity for enforcing the Detention Standards.

To the threadbare extent Plaintiff alleges a civil conspiracy, the record indicates no such conspiracy existed. Assuming *arguendo* Defendants reached an agreement on their treatment of Plaintiff, each Defendant acting in the scope of their employment cannot be held liable for the actions of other Defendants, particularly when their schedules do not overlap and no evidence exists to hint every Defendant met with every other Defendant. Officer Mosley, on the night shift, cannot be liable for the acts of Officer Luetkemyer, on the day shift. Their paths never crossed. Officer Funk, whose scope of employment was female juveniles, cannot be liable for the acts of Officer Brown, whose scope of employment was male juveniles. None of these public employees, acting in the scopes of their employment, may be liable for Plaintiff's alleged injuries caused by another Defendant.

To the extent Defendant Schaefer is among the individual Defendants, his role as Superintendent placed him in a position to determine policy and exercise discretion; he is entitled

to absolute immunity on Plaintiff's state law claims. Defendant Schaefer oversaw the operation of the Detention Center, enforced the Detention Center Operations Manual, and directed the actions of the officers. To whatever extent he used his discretion in these endeavors, he is entitled to absolute immunity. There is no evidentiary support for the liability of the Defendant officers in conspiracy or intentional infliction of emotional distress, and where Defendant Schaefer's officers are not liable, neither may Defendant Schaefer be liable. Defendant Schaefer and St. Clair County are absolutely immune for their failure to adopt or enforce any law, including the Detention Standards, and are concomitantly absolutely immune from their adoption of the Detention Standards and enforcement of those standards on Plaintiff.

Defendants, both individual and municipal, are entitled to absolute immunity Plaintiff's state law claims; therefore, Plaintiff's state law claims must be dismissed.

### III–M–3. Plaintiff's State Law Claims are Time Barred; 745 ILCS 10/1- 101, *et seq.*

Plaintiff's state law claims are time barred pursuant to the Tort Immunity Act; therefore, Defendants should receive summary judgment on Plaintiff's state law claims.

The Tort Immunity Act states "No civil action … may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8-101(a). The Seventh Circuit has explicitly held the one-year limitations period applies to state law claims filed in 42 U.S.C. §1983 actions. *Williams v. Lampe*, 399 F.3d 867, 870 (2005). Alternatively, claims brought under §1983 enjoy a two-year limitations period. *Ashafa v. City of Chicago,* 146 F.3d 459, 462 (7th Cir. 1998).

Plaintiff was detained in the Detention Center from March 17, 2015 to October 30, 2015. Plaintiff did not bring his lawsuit until December 16, 2016. This is in excess of one year following

the end of his detention. Plaintiff's lawsuit is clear and drafted with the aid of counsel. There are no allegations, in the Complaint or anywhere else that Plaintiff suffered from a disability or inability to bring this lawsuit within the one-year limitations period mandated by Illinois law. Plaintiff knew of his injuries as they accrued, when they purportedly accrued in October of 2015, and he knew every Defendant alleged to have committed Plaintiff's injuries, but Plaintiff waited more than a year to file suit. The Tort Immunity Act could not be clearer – *no* civil action may be commenced in *any* court against a local entity or *any* of its employees for *any* injury unless it is commenced within *one year* from the date the injury was received or the cause of action accrued. The portions of Plaintiff's lawsuit brought under Illinois law – Counts VI, VII, VIII, and X – are out of time and completely barred by this clear one year limitations period.

Because Plaintiff waited more than one year to file his state law claims against Defendants, the state law portions of Plaintiff's lawsuit must be dismissed.

## IV. Conclusion

WHEREFORE, Defendants, Donald Schaefer, St. Clair County, *et al.*, respectfully request this Honorable Court dismiss the Plaintiff's First Amended Complaint, enter judgment in favor of these Defendants, and for any and all other relief as this Court deems just and proper.

Respectfully submitted,

s/ Katherine A. Melzer

Katherine A. Melzer, #6313753
Thomas R. Ysursa, #6257701
Becker, Hoerner, Thompson & Ysursa, P.C.
5111 West Main Street
Belleville, Illinois 62226
Tel: (618) 235-0020
Fax: (618) 235-8558
kap@bhtylaw.com
try@bhtylaw.com

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on **October 19, 2018**, I electronically filed this document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

***For Plaintiff Delarren Mason:***

 Ms. Amy Breihan
 amy.breihan@macarthurjustice.org

 Ms. Shaleen Morales-Saldarriaga
 Shaleen.Morales@macarthurjustice.org

 Ms. LaToya M. Berry
 missberry_esq@yahoo.com

 Mr. Wilton Antoine Person
 wperson@personlaw.com

 Ms. Sheila Bedi
 sheila.bedi@law.northwestern.edu

 Ms. Vanessa del Valle
 vanessa.delvalle@law.northwestern.edu

 Mr. Locke Bowman
 l-bowman@law.northwestern.edu

***For Defendant Patrick Young:***

 Mr. Jarrod Beasley
 jpbeasley@kuehnlawfirm.com

***For Defendant Cheryl Prost:***

 Mr. Corey A.T Stegeman
 cstegeman@sandbergphoenix.com

 Mr. Untress L. Quinn
 uquinn@sandbergphoenix.com

     s/ Katherine A. Melzer