UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DELARREN MASON,<br><br>Plaintiff,<br><br>v.<br><br>SUPERINTENDENT DONALD SCHAEFER, ST. CLAIR COUNTY, OFFICER MIKE KLEB, OFFICER CRAIG BROWN, OFFICER PATRICK YOUNG, OFFICER DALE LUETKEMYER, OFFICER BRANDON MILLER, OFFICER ARIEL MOSLEY, OFFICER TYRONE SILLAS, OFFICER ZAC LUETKEMYER, OFFICER LUCAS GEHRS, OFFICER JOE VALLINA, OFFICER BRIANNE FUNK, OFFICER TERRENCE BENNETT, OFFICER JOE THOMPSON, NURSE PELLMANN, NURSE KOCHMANN, and CHERYL PROST,<br><br>Defendants. | Case No. 16-cv-1356-JPG-RJD |

## **MEMORANDUM AND ORDER**

This matter comes before the Court on the motion for summary judgment filed by defendant Cheryl Prost (Doc. 127). Plaintiff DeLarren Mason has responded to the motion (Doc. 147), and Prost has replied to that response (Doc. 157).

**I.     Summary Judgment Standard**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v.*

*Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the non-moving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways. It may present evidence that affirmatively negates an essential element of the non-moving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the non-moving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

## II.     Facts

Construed in the light most favorable to Mason, the evidence and the reasonable inferences that can be drawn from it establish the following relevant facts for purposes of the instant summary judgment motion. [1]

---

[1] The Court notes that Mason's response is nearly devoid of citation to evidence in the record other than general references to a response to Prost's statement of material facts ("SOMF") and Mason's SOMF, neither of which points to any specific paragraph of those SOMFs. Pl.'s Resp. to Prost's Mot. Summ. J. 1 (Doc. 147). In addition, Mason's response to Prost's SOMF is rife with citations to evidence without any indication of its location in the file, if it is even in the file. It is not the Court's function to "scour the record in search of evidence to defeat a motion for summary judgment." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). Nor is it the Court's function to construct a party's argument for him. *Spath Hayes Wheels Intern.-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000). The Court is certainly not obligated to review a party's SOMF or his response to the opposition's SOMF, and then figure out on its own how the facts cited therein support legal arguments made elsewhere. Therefore, to the extent Mason may fault the Court for overlooking a relevant fact in this order, he has waived that argument by failing to direct the Court to specific evidence in the record or to

In March 2015, Mason was 17 years old and suffered from mental health problems. On or around March 17, 2015, Mason was arrested and charged with armed robbery, although he did not actually commit that crime and the charges were eventually dismissed. Before the charges were dismissed, however, Mason was housed at the St. Clair County Juvenile Detention Center ("Detention Center") for more than eight months. While at the Detention Center, Mason's mental health problems manifested themselves in defiant behavior and anger control problems. As a consequence of his behavior problems, Mason was housed in isolation from other detainees in deplorable conditions for substantial periods of time.

During Mason's stay at the Detention Center, defendant Prost, an unlicensed psychological consultant, was under contract with the St. Clair County 708 Mental Health Board to provide mental health services to the Detention Center and the St. Clair County Probation Department. Her contract provided she was to work part-time—only fifty hours per month—although she was on call at all times and actually worked many more unpaid hours. Her primary duties were to perform court-ordered mental health evaluations for the Detention Center and the Probation Department and to evaluate detainees at the Detention Center to identify potentially suicidal detainees so official suicide risk assessments could be done and suicide prevention measures could be taken. Prost was not qualified to make mental health diagnoses or to prescribe medication herself, but she helped juvenile detainees' guardians (usually a parent) arrange for services in the community for detainees. She did this by giving the parents information about various agencies to contact and telling them how to initiate the procedure to obtain services. When Prost had previously worked full-time, she was able to provide counseling services for detainees, but after her employment was reduced to part-time in 2004,

---

explain the significance of that evidence to his legal argument.

she no longer had time to perform counseling and several other services she had performed as a full-time employee. This was the case even though the Detention Center Operations Manual stated that those services were available to detainees.

Detention Center policy prohibited Prost herself from making referrals for detainees to receive mental health services from providers outside the jail. This was because providers generally required permission to treat a juvenile from the juvenile's guardian and arrangements for payment before providing services, and the Detention Center was not the legal guardian of the detainee. Instead, Detention Center policy required Prost to notify the legal guardian that the detainee needed mental health services or medication and to rely on the guardian to make the necessary arrangements. If the guardian arranged an appointment with an outside provider, the local court would order the Sheriff's Office to transport the detainee to the appointment for the services.

When Mason arrived at the Detention Center on March 17, 2015, he reported in his initial screening that he had had mental health treatment in the past but had not taken any mental health medication for at least eight months. The intake officer contacted Prost because Mason indicated he had a history of taking psychiatric medications. After talking with the intake officer, Prost did not think any immediate action, such as suicide precautions, needed to be taken because there was no indication Mason was suicidal, was uncooperative, agitated or belligerent, or was behaving strangely at the time of admission to the Detention Center.

Prost was not unfamiliar with Mason in 2015. She had evaluated him in July 2013 pursuant to a court order following a battery that landed him in the Detention Center for three days. In that evaluation, she noted that Mason had a history of oppositional defiant behavior and anger control problems, needed treatment for cannabis abuse, and needed a psychiatric

4

assessment for potential bipolar disorder. At that time, Prost told Mason's mother, LaShunda Green, about resources available to help meet Mason's needs. Mason participated in court-ordered outpatient treatment at Chestnut Health Systems ("Chestnut") beginning in August 2013. In October 2013, Green took Mason to see a psychiatrist at Chestnut who diagnosed him with mood disorder, psychosis disorder, and oppositional defiant disorder and prescribed thirty days of medication for those conditions. He had stopped taking that medication eight months before he was detained in March 2015.

Shortly after arriving at the Detention Center in March 2015, Mason began displaying defiance and anger control problems. In response, and pursuant to Detention Center policy, Prost contacted Green on March 31, 2015. She told Prost that Mason had been diagnosed with ADHD and bipolar disorder. She also reported that Mason had been prescribed medication but that he had not taken it in eight months. Post asked Green to schedule a psychiatric appointment for Mason. Green said she would set up an appointment.

The following day, on April 1, 2015, Prost evaluated Mason's mental health status. Mason also reported to her that he had been diagnosed with ADHD and bipolar disorder, had been prescribed medication for his mental health, but had not taken the medication for at least eight months before he entered the Detention Center. Prost provisionally diagnosed Mason with ADHD, bipolar disorder, cannabis abuse, and traumatic brain injury and recommended the outpatient evaluation about which she had spoken to Green the day before.

Not long after, Mason got into a fight with another detained and was placed on "room confinement"—he was locked in his room without his property—for several days. Prost told Detention Center staff they needed to watch Mason very closely because such confinement was detrimental to his mental health. She had no authority to override the confinement order, but

5

she placed Mason on the higher of two suicide watch levels because of his anger control problems and because he had not received medication for bipolar disorder.

Three days later, on April 13, 2015, Prost moved Mason to the lower level suicide watch, met with him, and evaluated him again. She arrived at the same provisional diagnoses and concluded that no intervention was necessary at the time. She continued to rely on Green's representation that she would schedule an appointment for Mason, although she never contacted Green again to follow up or to offer to help arrange those services.

Green tried but was unable to make any appointment to get mental health services at Chestnut or to secure mental health medication for Mason. As a consequence, Mason's behavior problems continued, and Detention Center staff continued to isolate him from other detainees. Prost did not make any attempt to contact Chestnut or to obtain consent from Green to obtain permission for Chestnut to release Mason's health information to her.

Mason repeatedly told Detention Center personnel, including Prost, that he needed mental health medication to keep him calm and prevent his behavior problems. He also told staff, including defendant Detention Center Superintendent Donald Schaefer, that he needed to get mental health help.

In June, July and August, as Mason's behavior continued to cause him trouble, it became apparent to Prost that Green was not going to be successful in getting mental health treatment for him. On at least six occasions, Prost approached Schaefer, her immediate supervisor, to express concerns with Mason's mental health and consequent behavior problems and isolated confinement. It was clear to Prost that Mason had serious mental health problems that were causing him to misbehave at the Detention Center and that Green was not arranging the help he needed. Schaefer, who makes the Detention Center's policies, confirmed that Prost was not

6

allowed to make an outside mental health service appointment for Mason under Detention Center policy.

Mason suffered damages to his mental and emotional health as a result of the Detention Center's response to his behavioral problems. That harm might have been avoided had he received mental health evaluation and treatment during his stay in the Detention Center. He was released from detention on October 30, 2015, after all charges against him were dismissed.

Mason filed this lawsuit in December 2016 against Prost and other Detention Center employees. She brings three claims against Prost: Count III, a claim under 42 U.S.C. § 1983 for inadequate mental health care in violation of the Due Process Clause of the Fourteenth Amendment; Count VI, a state law claim for intentional infliction of emotional distress ("IIED"); and Count VII, a state law claim for civil conspiracy. She specifically faults Prost for failing to refer him for mental health services, to counsel him, and to provide medication.

Prost now asks the Court for summary judgment on all counts on the grounds that, in light of the limitations of her qualifications and the restraints placed on her by Detention Center policy, she acted appropriately. She also argues that her conduct was not extreme and outrageous or intended to cause Mason emotional distress and that she had no agreement with Schaefer to wrongfully deprive Mason of needed mental health services. For his part, Mason believes that, although Prost could not prescribe him medication, she should have counseled him and/or arranged mental health services for him outside the prison despite Detention Center policy and that her failure to do so was extreme and outrageous. He also contends Prost and Shaefer were both responsible for the Detention Center policy regarding obtaining outside mental health services for detainees.

**III. Analysis**

    A.    <u>Count III: Mental Health Care</u>

In Count III, Mason alleges Prost provided him inadequate mental health care in violation of the Due Process Clause of the Fourteenth Amendment because she failed to (1) refer him to a psychiatrist, (2) counsel him, or (3) provide him a diagnosis or prescription medications. Prost argues that there is insufficient evidence to show she was deliberately indifferent to his serious medical needs. Specifically, she argues that Mason did not, in fact, have ADHD or bipolar disorder and that she did not act with deliberate indifference in light of her limited professional capacity and Detention Center policies that prohibited her from seeking the treatment she thought Mason needed.

As a preliminary matter, Prost cites the incorrect standard for deciding whether a pretrial detainee's due process rights have been violated by the failure to provide adequate mental health care. Historically, the Court has applied to pretrial detainees the Eighth Amendment test for deliberate indifference to the mental health needs of convicted prisoners. *See Miranda v. County of Lake*, 900 F.3d 335, 350-51 (7th Cir. 2018); *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015). The test for an Eighth Amendment violation has two components, an objective and a subjective one. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). First, the need about which the inmate complains must be objectively serious. *Id.* Second, the defendants must have a sufficiently culpable state of mind, that is, she must at a minimum be deliberately indifferent. *Farmer*, 511 U.S. at 834. She is deliberately indifferent if she "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837.

The application of the deliberate indifference standard was called into question by the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). In *Kingsley*, a

8

pretrial detainee sued for excessive force, and the Supreme Court held that the appropriate standard for a pretrial detainee plaintiff's claim was whether the officers' purposeful or knowing use of force was objectively unreasonable, not whether the officers were subjectively aware that their use of force was unreasonable. *Id.* at 2470.

The Seventh Circuit Court of Appeals recently held that, in light of *Kingsley*, the standard for pretrial detainees facing serious medical needs is whether the medical professional's conduct was objectively unreasonable, not whether the professional acted with deliberate indifference. *Miranda*, 900 F.3d at 352. The Court of Appeals described the objective reasonableness test:

> After *Miranda*, then, the controlling inquiry for assessing a due process challenge to a pretrial detainee's medical care proceeds in two steps. The first step, which focuses on the intentionality of the individual defendant's conduct, remains unchanged and "asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case." *Id.* at 353. A showing of negligence or even gross negligence will not suffice. See *id.*; accord *Darnell v. Pineiro*, 849 F.3d 17, 35–36 (2d Cir. 2017) (concluding that "[a]ny § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence").
>
> At the second step . . ., we ask whether the challenged conduct was objectively reasonable. See *Miranda*, 900 F.3d at 354. This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable.

*McCann v. Ogle Cty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018).

Prost's argument that there is no evidence Mason actually had ADHD or bipolar disorder is a red herring. It does not matter what the exact diagnosis is or should have been as long as Mason had a serious for mental health treatment. Neither party seriously disputes that Mason had a serious need for mental health care.

Turning to the objective reasonableness question, the Court finds there is no evidence from which a reasonable jury could find Prost acted in an objectively unreasonable way. There

9

is evidence to support the first part of the inquiry—whether she acted purposefully, knowingly, or recklessly when she considered the consequences of handling Mason's case. A jury could easily find that Prost was aware of the dangers Mason faced by not having mental health care and that she acted knowingly in response.

Mason's case stumbles, however, on the second part of the inquiry—whether, considering the totality of the facts and circumstances, her response was reasonable. Put another way, the Court must ask whether a reasonable person in Prost's position would have responded as she did. The evidence is clear that Prost responded reasonably by declining to definitively diagnose Mason or prescribe him mental health medications. She was not qualified to do either, and a reasonable person in her position, with her qualifications, would not have acted beyond those qualifications.

It was also objectively reasonable for Prost not to refer Mason to a psychiatrist or another outside mental health care provider. The Detention Center's policy required her to leave that to Green, and it is not reasonable to expect Prost to defy Detention Center policy. Prost notified Green, who assured her she would arrange to get Mason what he needed. When it became apparent that Green was not having success in arranging the outside care, Prost expressed her concerns to Schaefer, the Detention Center's policymaker and double-checked that Detention Center policy prevented her from doing anything more. That is all she had the power or authority to do in her position. To the extent this response was inadequate to care for Mason's mental health needs, it was the Detention Center's fault for not providing adequate in-house mental health resources or allowing outside referrals, not Prost's fault for following the Detention Center's policy.

Mason notes that Prost was incorrect in her belief that she lacked legal authority to

arrange mental health care for Mason because he was a juvenile and she was not his guardian. Under Illinois law, a juvenile 12 years old or older may request and receive mental health care without his parent's permission or knowledge and free of charge. 405 ILCS 5/3-501(a) (2015). Nevertheless, Detention Center policy prevented her from arranging care for Mason beyond notifying his mother and asking her to arrange care for him.

Finally, Mason faults Prost for not counseling him in the jail. However, although counseling inmates was envisioned as one of the services Prost was hired by the Detention Center to perform, the Detention Center did not provide her sufficient resources (*e.g.*, pay for more than 50 hours a month) to perform those services in light of other, higher priority services she was engaged to perform (conducting court-ordered mental health evaluations and identifying potentially suicidal detainees for immediate protection). No reasonable jury could find someone in Prost's position behaved unreasonably by attending to higher priorities, leaving no time to devote to other tasks. That she voluntarily worked without pay for at least as many hours as she was paid does not suggest she was unreasonable for failing to work even more hours. On the contrary, it is evidence of the inadequacy of the Detention Center to provide sufficient resources to meet the mental health needs of the detainees it housed.

Mason also argues that Prost voluntarily contracted to provide mental health care for inmates, so she should be liable when adequate care is not provided. In support of this proposition, Mason cites a case in which a health services company agreed by contract to assume a jail's duty to provide medical services to arrestees and detainees and could therefore be liable for failure to provide adequate services. *Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013). The case at bar is easily distinguishable. In *Currie*, the corporate provider assumed the jail's constitutional duties and was responsible for providing adequate staff working adequate hours to

make sure those duties were fulfilled. Prost, on the other hand, did not contract to fulfill all of the Detention Center detainees' mental health care needs; she contracted to work 50 hours a month toward that end (along with working for the Probation Department).[2]

Furthermore, the work she did in those 50 hours was still constrained by Detention Center policy, which prevented her from seeking assistance from outside providers. It is absurd to suggest that the entirety of the Detention Center's duty to provide mental health services could be satisfied in so few hours—as is evidenced by the number of hours Prost actually worked in excess of the 50 required—or that any individual provider would assume such a duty, with the restrictions of Detention Center policy, for the sum Prost was paid. By the same token, the Detention Center cannot relieve itself of its duty to provide adequate mental health care to detainees by contracting with a single provider who cannot possibly perform the needed services in the time allowed, and then placing restrictions on how she can perform those services. Any objective unreasonableness falls not on Prost.

Taking a wider view than the three discrete ways Mason claims Prost was delinquent in providing him the mental health services he needed, a reasonable jury could still not find Prost behaved in an objectively unreasonable way. She was aware of Mason's mental health needs from her contacts with him in both 2013 and 2015. When she was alerted that he had arrived at the Detention Center and had been on mental health medication in the past, she spoke with the intake officer, considered his observations of Mason's behavior and that Mason was not

---

[2] While it is not relevant to this case, the parties have cited to Prost's 2017 contract to perform services (Doc. 147-7). In that contract, she agreed to "perform psychological services" for detainees of the Detention Center, Contract § 2.a., not to provide *all* the mental health services the Detention Center was obligated to provide to detainees. If her 2015 contract had a similar provision, that would undercut Mason's argument that she had voluntarily assumed the Detention Center's constitutional duty to provide all mental health services required by detainees.

currently taking any medication, and reasonably determined that he was not a suicide risk in need of immediate protection. When she learned Mason was behaving badly, she contacted Green and asked her to schedule a psychiatric appointment for Mason. Had Green scheduled such an appointment, Mason would have been transported to the appointment pursuant to a court order.

For a period of time, it was reasonable for Prost to rely on Green's assurances that she would arrange for Mason to see a mental health provider, but when it became apparent that was not going to happen, Prost's options were limited. She could not diagnose him or prescribe him medication because she was not qualified to do so. She could not make a referral for him because Detention Center policy prevented it. She could not counsel him because there were not enough hours in the day. She chose to speak to Schaefer about it at least six times, hoping that there was room in the Detention Center policy for her to arrange the mental health treatment Mason needed. There was not. It is true that she could have contacted Green to push her to make a psychiatric appointment for Mason, but the Court does not think a reasonable jury could find it was objectively unreasonable that she did not. She had already informed Green of the necessity of the services. In light of her already inadequate work hours and the other high-priority tasks she needed to perform, no reasonable jury could find Prost acted unreasonably by not following up with a parent who failed, for whatever reason, to arrange needed care for her child. This is especially true where Green did not contact Prost to ask for her help or advice or seek Prost out on her weekly visits to Mason in the Detention Center.

For these reasons, the Court believes no reasonable jury could find Prost was objectively unreasonable in her response to Mason's need for mental health care. Accordingly, Prost is entitled to summary judgment on Count III.

13

B.      <u>Count VI:   State Law IIED</u>

In Count VI, Mason claims Prost's conduct in response to his mental health needs was extreme and outrageous, was rooted in an abuse of power and authority, and was undertaken intentionally or recklessly to cause Mason severe emotional distress. Prost argues that her conduct toward Mason was not extreme or outrageous and was not undertaken with the intention to cause him emotional distress. She notes that she lacked the power and authority over him that would contribute to finding her conduct was outrageous

A claim for IIED has three elements: (1) the conduct involved was "truly extreme and outrageous," (2) the defendant either intended to inflict, or knew there was a high probability she would cause, severe emotional distress, and (3) the defendant actually caused severe emotional distress. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (citing *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). To support an IIED claim, the conduct must be "so severe that no reasonable man could be expected to endure it." *Feltmeier*, 798 N.E.2d at 84 (citing Restatement (2d) of Torts § 46, comment j, at 77-78 (1965)).

The Court has already discussed above why no reasonable jury could find Prost's response to Mason's mental health needs was objectively unreasonable. For the same reasons, the Court finds that such conduct could not rise to the level of being "truly extreme and outrageous." For Mason's entire stay in the Detention Center, Prost attempted by the means available to her to ensure that he received mental health care. The fact that her efforts were not successful in obtaining that care and that Mason suffered emotional distress as a result is unfortunate, but it does not render her conduct outrageous.

For this reason, Prost is entitled to summary judgment on Count VI.

C.     Count VII:   State Law Civil Conspiracy

In Count VII, Mason claims Prost conspired with Schaefer to deny Mason access to mental health services.   Prost argues that her compliance with the Detention Center's rules created by Schaefer, the policymaker for the Detention Center, does not amount to conspiracy. Mason contends that even without an express agreement to deny Mason care, one can be inferred from circumstantial evidence.

A state law claim for conspiracy has three elements:   "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act."   *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004) (citing *Adcock v. Brakegate, Ltd.,* 645 N.E.2d 888, 894 (Ill. 1994)).   "[T]he agreement is a necessary and important element of a cause of action for civil conspiracy," although it is not in and of itself a tort.   *Adcock*, 645 N.E.2d at 894.

The Court agrees with Prost that there is no evidence from which a reasonable jury could conclude that Prost and Schaefer agreed with each other to purposefully deprive Mason of the mental health services he needed.   On the contrary, the evidence shows that Schaefer adopted a Detention Center policy limiting the avenues Prost was allowed to follow to ensure Mason got the care he needed, and Prost followed that policy, on occasion expressing to Schaefer that she was concerned about how the policy was affecting Mason.   No reasonable jury could conclude that the two came to any agreement to purposefully cause Mason harm.

For this reason, the Court finds Prost is entitled to summary judgment on Count VII.

**IV.  Conclusion**

For the foregoing reasons, the Court:

15

- **GRANTS** Prost's motion for summary judgment (Doc. 127). Prost is terminated as a party to this case;

- **DENIES as moot** Prost's motion to exclude portions of the expert report and testimony of David Muhammad (Doc. 104);

- **DENIES as moot** Prost's motion to exclude portions of the expert report and testimony of Louis J. Kraus, M.D. (Doc. 106);

- **DENIES as moot** Mason's motion to exclude portions of the testimony of Malinda Vogel, an expert offered by Prost (Doc. 109); and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**DATED:   January 14, 2019**

                                          s/ J. Phil Gilbert
                                          **J. PHIL GILBERT**
                                          **DISTRICT JUDGE**